WALLACE, Judge,
Concurring in part and dissenting in part.
During the voir dire examination at Nicholas’ trial, no one asked the members of the venire if they knew Nicholas or any of the prospective witnesses. The majority holds that one of the members of Nicholas’ jury committed misconduct by failing to volunteer that he was acquainted with Tamiko James and Nicholas. But a juror does not conceal information when the juror accurately answers the questions propounded to the juror during voir dire, and because the State failed to use due diligence in seeking the information, the juror was not guilty of misconduct.
For these reasons, I respectfully dissent from the majority’s approval of the trial court’s removal of the juror. I would reverse Nicholas’ judgment and sentence for conspiracy to traffic in cocaine and remand for a new trial on that charge. I concur in the balance of the majority opinion.
My reading of the record in this case differs from the majority’s perspective in several respects, and I have stated the pertinent facts in some detail before discussing the legal issues.
I. THE FACTS

A. The Charges, the Verdicts, and the Sentences

The charges against Nicholas and his codefendants arose out of an investigation conducted by the Tampa Police Department from May 2005 through October 2005. The investigation targeted a number of individuals believed to be involved in the distribution and sale of cocaine in the Tampa area. Several of the targets were related to each other. The investigation culminated in the filing of a twenty-count information, naming sixteen individual defendants.
Nicholas was named as one of the defendants in counts one through four of the information. These charges included racketeering (count one); conspiracy to engage in racketeering (count two); trafficking in cocaine, 400 grams or more but less than 150 kilograms (count three); and conspiracy to traffic in cocaine, 400 grams or more but less than 150 kilograms (count four). Each of the crimes charged is a first-degree felony. § 893.135(l)(b)(l)(c), (5); § 895.03(3), (4), Fla. Stat. (2005). The jury was unable to reach a verdict on counts one and two, and the State subsequently nolle pressed those counts. The jury found Nicholas guilty on counts three and four. But it found that the quantity of cocaine involved in the trafficking and conspiracy to traffic charges was the lesser amount of 200 to 400 grams instead of 400 grams to 150 kilograms.
The trial court adjudicated Nicholas guilty in accordance with the jury’s verdict[11] and sentenced him to a term of *308 twenty years for each offense, concurrent, with a seven-year mandatory minimum. It also imposed the required $200,000 fine.

B. The Trial

The trial court tried the charges against Nicholas and two of the other fifteen defendants in a joint trial. Because Nicholas had made out-of-court statements that were inadmissible against the other two defendants, the trial court ruled that two separate juries would be used to try the case — one for Nicholas and another for the two other defendants. The lawyers selected the jury for the two other defendants first and then selected the jury that would hear the charges against Nicholas.
The State’s case against Nicholas and the other two defendants was based largely on the testimony of two of their codefen-dants, Sidney Deloch and Tamiko James. Deloch is Nicholas’ cousin; Tamiko James is his brother. Before trial, Deloch and Tamiko James both entered open pleas to the charges against them and agreed to cooperate with the State and to testify at the trials of their codefendants. Each man admitted to having six prior felony convictions. Because of the nature of the multiple charges against them and their extensive prior criminal records, both De-loch and Tamiko James faced the possibility of being sentenced to lengthy prison terms. Both men candidly admitted in their trial testimony that they hoped to obtain leniency at sentencing in exchange for their cooperation. Tamiko James, who was released from jail on bond, also acknowledged that he was receiving cash payments from the Tampa Police Department.
The trial began on a Monday and lasted four days. At the beginning of jury selection in the Nicholas case, the trial court asked the venire several questions. One of these questions was, “[A]re any of you related by either blood or marriage to the defendant in this case, James Nicholas?” The members of the venire responded in the negative. The trial court did not ask the members of the venire either individually or collectively whether they were acquainted with Nicholas or the prospective witnesses in the case. Neither the prosecutor nor defense counsel asked these questions either.

C. The State’s Request to “Strike” the Juror

Tamiko James testified on Tuesday afternoon, the second day of the trial. During a break in his testimony, the prosecutor moved to “strike” a juror from the jury panel whom Tamiko James reportedly recognized while testifying. Before ruling, the trial court properly agreed to interview both Tamiko James and the juror outside the presence of the other members of the jury.
The transcript of the interviews reveals that the prosecutor believed that the juror had been asked during voir dire if he was acquainted with Nicholas and Tamiko James and that the juror had responded in the negative. In support of her motion, the prosecutor initially asserted: “Tamiko James, [the juror] knows him. [The juror] knows [Nicholas]. [The juror] obviously has past experience with him. When he was asked about that he obviously said he didn’t.”[12] (Emphasis added.)
*309 The trial court conducted the interview with Tamiko James first. After the interview with Tamiko James was completed, the prosecutor reiterated her understanding that the venire had been asked: “Does anyone know these people[?]” At this point, the trial court and defense counsel pointed out — correctly—that the question posed was whether anyone was related to the defendant “by blood or marriage.” However, when it was her turn to question the juror, the prosecutor again accused him of failing to respond honestly and completely to the questions posed during voir dire. The prosecutor interrogated the juror as follows: “Okay. Okay. I just, I’m just confused about why you wouldn’t have told us this when we asked if you knew anybody?” The juror responded: “No. You asked if I was in their family.” The juror’s recollection was correct. The trial court again reminded the prosecutor that the question posed had been if they were “[rjelated by blood or marriage.”[13]
The interviews with Tamiko James and the juror revealed that the nature of the contacts between Tamiko James, Nicholas, and the juror were both remote in time and limited in nature. The only connection established between them was that the juror had attended the same junior high school or high school that the two brothers had attended. We do not know the juror’s age. However, Tamiko James was thirty-two years old at the time of trial; Nicholas was thirty. Thus the three men’s last contact in high school could not have occurred more recently than twelve years before the trial. The juror testified that he had not seen Tamiko James in seven or eight years. More important, the juror repeatedly affirmed that he could be fair and impartial. When the prosecutor questioned the juror on this subject, the juror responded: ‘Well, I mean, whether I know [Tamiko James and Nicholas] or not has nothing to do with being fair or not.”
In the interviews, Tamiko James claimed that he had sold cocaine and marijuana to the juror and had smoked marijuana with him. The juror denied these claims and also denied using drugs. The trial court made no findings concerning Tamiko James’ assertions about selling drugs to the juror and smoking marijuana with him. This court is certainly not in a position to resolve these disputed factual issues. Nevertheless, the majority is inclined to accept what it calls Tamiko James’ “revelations” at face value. In my view, this credulous approach to Tamiko James’ questionable claims is unwarranted, not only because of the absence of any findings on this subject by the trial court but also in light of Tamiko James’ agreement to testify against his brother in the hope of receiving leniency at sentencing, his six prior felony convictions, and his receipt of cash payments from the law enforcement department that was responsible for investigating the case.
After the prosecutor completed her interrogation of the juror, the trial court summed up by stating that the juror had “indicated he can be fair and impartial.” *310 At this point, the juror said: “That would just indicate it is a jury of peers, correct?” The trial court responded: “I suppose. Thank you, sir.” When the prosecutor mentioned this statement the next day during the argument on her motion, the trial court acknowledged, “Yes, he did make that statement.” But the trial court did not comment on the statement or place any reliance on it in ruling to remove the juror.

I). The Parties’ Arguments and the Trial Court’s Ruling

After the interviews, the trial court took the State’s motion to “strike” the juror under advisement and gave the parties an opportunity to perform legal research and to prepare their arguments. The trial court took up the issue again on Wednesday morning before testimony resumed. The trial court summarized the information developed at the interviews the prior afternoon as follows:
There was an indication from the witness, Tamiko James, that he knew [the juror], that [the juror] went to school with him and also was in the same school or with the defendant Mr. Nicholas. Mr. Tamiko James also made an implication that he had done drugs with [the juror] and that [the juror] had, I think, bought drugs from him and that had occurred back in the nineties.
The Court inquired of [the juror] in a private bench conference and [the juror] admitted recognizing Mr. James and that they had gone to school together or were in school around the same time together. He denied, of course, any drug usage and was naturally, I think, taken aback by the accusation and a little defensive about it, as I think anybody would be.
The trial court then invited the parties to make their arguments.
The prosecutor argued that the trial court had the discretion to dismiss the juror because he knew Tamiko James and Nicholas. The prosecutor said that if she had known that the juror was acquainted with the two brothers, she would have exercised a peremptory challenge to strike him. Finally, the prosecutor suggested that the interview with the juror had become “somewhat ... confrontational.” She expressed concern that the interview “may now have caused some ill will on behalf of the juror either against the State or the Court or, I don’t know.”
Defense counsel objected strenuously to the removal of the juror and made several arguments in opposition to the motion. First, the removal of the juror was unwarranted because the juror was not guilty of any misconduct. He had truthfully answered all questions put to him during voir dire. Also, the juror had repeatedly affirmed his ability to be fair and impartial. Second, the State was not entitled to the removal and replacement of the juror with an alternate because the prosecutor had failed to ask him any questions about his prior acquaintance with Nicholas or the prospective witnesses. Third, defense counsel pointed out that Nicholas and the juror were both African-American males. The alternate slated to replace the juror if he were removed was a white male. Thus the State’s belated attempt to strike the juror after announcing its acceptance of the panel would alter the composition of the jury to Nicholas’ detriment. Finally, in response to the suggestion that the interview with the juror had become “confrontational,” defense counsel pointed out that the juror’s reaction resulted from the prosecutor’s attempt
to instigate a juror that you don’t want to be on the jury into saying something in front of the Judge but can’t get him to do it and keep pushing that envelope to *311 where you feel now he’s got a problem with you that’s neither Mr. Nicholas’ fault, the juror’s faulty or the defense[’]s fault.
After hearing the attorneys’ arguments, the trial court ruled that the “juror did conceal information which may have been of materiality as to whether the juror could be excused on a peremptory challenge or for cause.”[14] Based on this ruling, the trial court announced that it would remove the juror and replace him with one of the alternates. The trial court also noted that “there remains an African American female on the jury, not that I think that’s an issue one way or the other.” Defense counsel promptly moved for a mistrial. The trial court noted that there was a suitable alternate juror available and denied the motion for mistrial.
II. FLORIDA RULE OF CRIMINAL PROCEDURE 3.280(a) AND ITS LIMITATIONS
Procedures for alternate jurors are controlled by Florida Rule of Criminal Procedure 8.280. The rule provides, in pertinent part, as follows:
(a) Selection. The court may direct that jurors, in addition to the regular panel, be called and impanelled to sit as alternate jurors. Alternate jurors, in the order in which they are impanelled, shall replace jurors who, prior to the time the jury retires to consider its verdict, become unable or disqualified to ‘perform their duties.
(Emphasis added.) The language of the rule limits the trial court’s power to replace members of the jury panel with an alternate to circumstances where a panel member is either unable or disqualified to perform his or her duties. In reviewing cases applying rule 3.280(a), a question arises as to whether the limitations in the rule are merely advisory on a court or enforceable by a defendant. Stated differently, one may ask if the rule’s limitations reflect that a defendant has a protected interest in the chosen jury through the end of the trial. Although a comprehensive discussion of this issue is beyond the scope of this opinion, I submit that a defendant does have a protected interest in a chosen jury and that this interest should weigh significantly in any decision that impacts the composition of the jury once impan-elled.[15]
During the jury selection process and before the jury is sworn to try the case, a criminal defendant has no right to have any particular juror or jurors serve. Instead, the defendant is only entitled to a fair and impartial jury. See Lambrix v. Dugger, 529 So.2d 1110, 1112 (Fla.1988) (citing Piccott v. State, 116 So.2d 626 (Fla.1959)); see also Bailey v. Deverick, 142 So.2d 775, 777 (Fla. 2d DCA 1962) (citing Piccott, 116 So.2d 626, and applying the rule in a civil case). But once the jury has been impanelled, the defendant has a protected interest in having the chosen jury decide his or her case. As the United States Supreme Court has explained, this right is protected by the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution:
The reason for holding that jeopardy attaches when the jury is empaneled and sworn lies in the need to protect the interest of an accused in retaining a *312 chosen jury. That interest was described in Wade v. Hunter, [336 U.S. 684, 69 S.Ct. 834, 93 L.Ed. 974 (1949) ], as a defendant’s “valued right to have his trial completed by a particular tribunal.” 336 U.S. at 689, 69 S.Ct. at 837. It is an interest with roots deep in the historic development of trial by jury in the Anglo-American system of criminal justice. Throughout that history there ran a strong tradition that once banded together a jury should not be discharged until it had completed its solemn task of announcing a verdict.
Crist v. Bretz, 437 U.S. 28, 35-36, 98 S.Ct. 2156, 57 L.Ed.2d 24 (1978) (footnote omitted). The criminal defendant’s protection against being twice put in jeopardy for the same offense under the United States Constitution and article I, section 9, of the Florida Constitution means that “[t]he defendant has a right to have his trial completed by a particular jury of his choosing.” Douglas v. State, 28 So.3d 931, 933 (Fla. 3d DCA 2010) (citing Thomason v. State, 620 So.2d 1234 (Fla.1993)). Thus, if a criminal trial has commenced and the State is unable to prove its case, the defendant’s interest in having his trial completed by the particular jury he has chosen prevents the trial court from declaring a mistrial to permit the State to put the defendant on trial again before a different jury. Similarly, the defendant’s right to have his trial completed by the particular jury he has chosen limits the trial court’s power to remove a member of the jury panel arbitrarily or for an improper purpose.
In considering Federal Rule of Criminal Procedure 24(c), which is comparable to rule 3.280(a), one federal court explained the reason for the limitations on a trial court’s power to remove jurors in the middle of a trial as follows:
Like the unjustified declaration of a mistrial, the unjustified replacement of an empaneled juror may jeopardize the defendant’s rights regardless of the judge’s precise motivation, and whether or not the judge is biased or acting in bad faith. Wisely, Rule 24(c) therefore does not merely forbid the replacement of jurors on inappropriate grounds. Instead, the Rule protects the defendant’s jury trial rights by specifying the only acceptable reasons for removal: incapacity and disqualification. The premise is that an empaneled juror, having passed voir dire examination and the parties’ peremptory challenges, will serve to the end of trial unless compelling reasons require the juror’s premature discharge. This approach, which adheres to the common-law rule, is prophylactic; it minimizes the chance that the trial court will, intentionally or unintentionally, place a judicial thumb on the scales by altering the jury’s composition after it begins to hear the evidence.
Hinton v. United States, 979 A.2d 663, 682 (D.C.2009) (en banc) (footnote omitted).
III. MISCONDUCT AND CONCEALMENT: THE DE LA ROSA TEST
Here, it was error for the trial court to remove the juror unless he was unable to continue to serve or was disqualified. There is no contention that the juror was unable to continue to serve. In fact, after the trial court had ruled on Wednesday morning that the juror would be removed, he remained on the jury until Thursday afternoon when the jury retired to deliberate. Thus the trial court erred in removing the juror unless he became disqualified for misconduct. See Washington v. State, 955 So.2d 1165, 1172 (Fla. 1st DCA 2007).
The concealment by a juror of material information during voir dire is a form of misconduct. A juror’s concealment of ma *313 terial information during voir dire may warrant relief in the form of the removal of the offending juror or a new trial. The question of whether a juror has concealed material information during voir dire so as to warrant the juror’s removal or the grant of a new trial is subject to the three-part De La Rosa test:
First, the complaining party must establish that the information is relevant and material to jury service in the case. Second, that the juror concealed the information during questioning. Lastly, that the failure to disclose the information was not attributable to the complaining party’s lack of diligence.
De La Rosa v. Zequeira, 659 So.2d 239, 241 (Fla.1995). Although De La Rosa is a civil ease, the three-part test also applies in criminal cases. See Murray v. State, 3 So.3d 1108, 1121-22 (Fla.2009); Marshall v. State, 664 So.2d 302, 304 n. 2 (Fla. 3d DCA 1995). An examination of the three prongs of the De La Rosa test will be instructive for the analysis of the legal issues concerning the removal of the juror in this case.

A. Relevancy and Materiality

A juror’s concealment of information during voir dire does not necessarily amount to misconduct warranting relief. “Pursuant to De La Rosa’s first prong, the complaining party must establish not only that the nondisclosed matter was ‘relevant’ ... but also that it is ‘material to jury service in the case.’ ” Roberts v. Tejada, 814 So.2d 334, 339 (Fla.2002) (quoting De La Rosa, 659 So.2d at 241). A juror’s nondisclosure of information is considered material where “the omission [of the information] prevented counsel from making an informed judgment — which would in all likelihood have resulted in a peremptory challenge.” De La Rosa, 659 So.2d at 242 (quoting Bernal v. Lipp, 580 So.2d 315, 316-17 (Fla. 3d DCA 1991)).
The question of whether a juror’s acquaintance with a witness or a party is relevant and material depends on the circumstances. For example, a juror answered in the negative when he was asked on voir dire “if he was related to or close friends with any law enforcement officers.” Bigham v. State, 995 So.2d 207, 215 (Fla.2008). Once the testimony began, the juror informed the court that he recognized one of the State’s witnesses, a police officer. Id. However, the juror’s acquaintance with the officer was only casual; they were not close friends. Id. In addition, the juror’s contacts with the police officer had ended five to seven years before the trial. Id. On these facts, the Supreme Court of Florida held that the defendant was not entitled to a new trial because — among other things — the juror’s acquaintance with the police officer was so casual and remote in time that it was not material. Id.
Similarly, this court held that the trial court did not commit error in allowing a juror to remain on the jury panel when the juror realized after voir dire examination that he was acquainted with the victim of a rape for which the defendant was on trial. Porter v. State, 214 So.2d 73, 73-74 (Fla. 2d DCA 1968). The juror’s employment required him to service the refrigeration equipment where the victim was employed. Id. This court’s opinion suggests that the information was not material because the juror’s acquaintance -with the victim was only casual. Id. In another case involving a casual acquaintance, the Supreme Court of Florida held that a trial court did not err in declining to grant a mistrial when one of the State’s witnesses announced after testifying that he recognized one of the jurors as a person he had become acquainted with at a bar the witness frequented. DuBoise v. State, 520 So.2d 260, 264 (Fla.1988).
*314 On the other hand, where a juror in a criminal case failed to disclose when asked that he had previously been represented by the state attorney, the supreme court held that the defendant was entitled to a new trial. White v. State, 129 Fla. 885, 176 So. 842, 844-45 (1937). The prior representation of the juror by the attorney responsible for prosecuting the defendant was obviously relevant and material to the juror’s service in the case. Id. at 844.

B. Concealment

Concealment occurs when a juror fails to disclose information in response to a question or questions propounded during voir dire. For example, after a juror had been sworn, she revealed that on her juror questionnaire she had concealed material information about the crimes of which she had been a victim. Garrido v. State, 955 So.2d 1195, 1196 (Fla. 3d DCA 2007). Because of the juror’s concealment of material information, the Third District held that the trial court erred in refusing to remove the juror and declare a mistrial. Id. The Fourth District reached the same result on similar facts in Mobley v. State, 559 So.2d 1201, 1202 (Fla. 4th DCA 1990) (reversing and remanding for a new trial when a juror denied being a victim of a crime upon being asked during voir dire and deprived the defendant of an opportunity to strike the juror with a peremptory challenge). The juror in the White case concealed material information; when asked, he failed to disclose that he had previously been represented by the state attorney. White, 176 So. at 844-45.
Conversely, there is no concealment when a juror accurately answers the questions propounded on voir dire. In the Bigham case, the juror answered in the negative when asked on voir dire “if he was related to or close friends with any law enforcement officers.” Bigham, 995 So.2d at 215. The juror’s contacts with the police officer that the juror recognized after the testimony began were both casual and remote in time. Id. In fact, the juror was neither related to nor a close friend of the officer. Thus, because the juror had accurately answered the question posed on voir dire, there was no concealment and the defendant was not entitled to a new trial. Id. In another criminal case, this court held that a juror did not falsely answer any questions about his wife’s former employment with the state attorney’s office. State v. McGough, 536 So.2d 1187, 1189 (Fla. 2d DCA 1989). The question propounded to the juror was whether his wife was employed outside the home. He truthfully answered, “Not at this present time.” Id. The juror did not conceal the fact that his wife had previously worked for the state attorney’s office because he was not asked about his wife’s prior employment history.
Thus a juror discharges his duty on voir dire when the juror provides accurate information to the questions propounded by the court or counsel. A juror who truthfully answers the questions posed on the juror questionnaire, if any, and during voir dire does not commit misconduct even if additional questions might have yielded relevant and material information.

C. The Due Diligence Test

De La Rosa’s third prong is known as the “due diligence” test. The supreme court has explained:
The “due diligence” test requires that counsel provide a sufficient explanation of the type of information which potential jurors are being asked to disclose, particularly if it pertains to an area about which an average lay juror might not otherwise have a working understanding. Thus, resolution of this “diligence” issue requires a factual de *315 termination regarding whether the explanations provided by the judge and counsel regarding the kinds of responses which were sought would reasonably have been understood by the subject jurors to encompass the undisclosed information.
Roberts, 814 So.2d at 343. The due diligence test places the responsibility on counsel for obtaining information material to the exercise of a peremptory challenge, not on the trial court or on the members of the venire. It follows that a juror does not commit misconduct where the juror’s omission to disclose relevant and material information results from counsel’s lack of diligence in making the appropriate inquiries. See McGough, 536 So.2d at 1189; Blaylock v. State, 537 So.2d 1103, 1107 (Fla. 3d DCA 1988).
IV. THE APPLICATION OF DE LA ROSA TO THIS CASE

A. Relevancy and Materiality

One could argue that the information about the juror’s prior acquaintance with Tamiko James and Nicholas was not relevant and material to the juror’s service in this case. The question of the juror’s alleged purchase of drugs from Tamiko James and smoking marijuana with him was never resolved one way or the other. The only facts that were established indicated that the three men were acquainted because they had attended the same junior high school or high school more than a decade before. The juror had not seen Tamiko James in seven or eight years. These contacts were certainly as limited in scope and even more remote in time than the juror’s acquaintance with the police officer that was held not to be material in Bigham, 995 So.2d 207.
Nevertheless, the prosecutor stated that she would have exercised a peremptory challenge against the juror if she had been informed of the facts. The prosecutor also asserted that she had “race neutral reasons to strike [the] juror.” In a prosecution such as this one, it is more likely than not that the prosecutor would have exercised one of her peremptory challenges against the juror if she had known that he was acquainted with Tamiko James and Nicholas because he had attended school with them years before. Also, the trial court found that the information “may have been of materiality.” For these reasons, I will assume for the purpose of my analysis that the State satisfied De La Rosa’s relevancy and materiality prong.

B. Concealment

As I have already explained, the prosecutor’s motion to “strike” the juror was grounded on her misapprehension that the juror had failed to respond truthfully when asked if he knew Nicholas or any of the prospective witnesses. In fact, no one propounded this or any similar question. As the trial court and the juror himself pointed out, the question posed to the venire was whether any of them was related to the defendant by blood or marriage. The juror was not related to the defendant by blood or marriage, and he answered this question truthfully. There was no concealment because the juror’s answers to the questions propounded on voir dire were accurate. See Bigham, 995 So.2d at 215; McGough, 536 So.2d at 1189.
The decision in Allen v. State, 493 So.2d 1080 (Fla. 1st DCA 1986), is on point. In Allen, a juror failed to inform the court that he was acquainted with the defendant’s spouse. Id. at 1080. On appeal, the First District held that the juror’s omission to inform the court did not raise an inference of juror misconduct because “no inquiry was made of the juror in this regard.” Id. at 1080-81. In this case, as in Allen, no concealment occurred because no *316 inquiry was made of the juror concerning his acquaintance with the individual or individuals in question. Because no concealment occurred, the trial court erred in removing the juror and replacing him with an alternate.
The majority’s conclusion that the juror concealed information rests on his purported violation of the trial court’s “open-ended, general directive to all prospective jurors.” In this directive, the trial court asked the members of the venire to be candid and forthcoming in their answers to counsel’s questions. I expect that similar requests are commonplace in jury trials conducted in this state. The majority’s conclusion rests on the proposition that when the trial court makes such an open-ended request to the venire, a juror conceals information when the juror fails to volunteer information that counsel might have found material if he or she had asked for it.
I offer two answers to the majority’s claim. First, there is no authority in Florida law for such a proposition. A trial court’s suggestion to members of the veni-re to be candid and forthcoming in their answers to counsel’s questions does not alter Florida law concerning what constitutes concealment. And, as I have shown, no concealment occurs if a juror provides accurate answers to the questions that are actually propounded to the juror. The juror need not go further and volunteer additional information not called for by the questions. See id. at 1080-81.
Second, the majority’s idea of concealment is at odds with courtroom practice and places an unrealistic burden on the venire members. Trial lawyers are trained and experienced in picking juries and trying cases. Lawyers are intimately familiar with the facts of a case they are about to try. Any trial lawyer worth his or her salt will have a good idea about what connections, associations, occupations, life experiences, and attitudes are material to picking a jury for a particular case. A large part of a trial lawyer’s task is to determine and elicit from the members of the venire the information necessary to the intelligent exercise of challenges for cause and peremptory challenges.
On the other hand, most citizens summoned for jury duty will have little or no familiarity with the jury selection process. Although the lawyers know the facts of the case to be tried, the prospective jurors will know little or nothing about the case. A citizen called for jury duty cannot be expected to know what information will be significant to the lawyers for picking a jury in a particular case. A prospective juror is not required to read the lawyers’ minds and volunteer information that he or she might imagine the lawyers would want to know. The responsibility for conducting an effective voir dire examination is on the lawyers, not the venire members. A citizen called for jury duty in a ease the citizen knows little or nothing about ought not to be accused and found guilty of misconduct based on his or her failure to anticipate and volunteer information that a lawyer might want to know but failed to request. But this is the result the majority approves in this case.

C. The Due Diligence Test

The trial court also erred in removing the juror because the State was guilty of a lack of diligence in questioning the juror. As this court has previously stated, the due diligence prong is not satisfied “when the failure to disclose the potential juror’s concealment or untruthfulness on voir dire was due to a lack of diligence by the complaining party.” McGough, 536 So.2d at 1189. Inquiry into a potential juror’s knowledge or acquaintance with the par *317 ties and the prospective witnesses is a fundamental area'of inquiry that should be pursued in almost every voir dire examination. See Anne M. Payne & Christine Cohoe, Jury Selection and Voir Dire in Criminal Cases, 76 Am. Jur. Trials 127, 206 (2000); Windle Turley, Voir Dire: Preparation and Execution, in The Litigation Manual: A Primer for Trial Lawyers 409, 414 (ABA 2d ed. 1989).
Here, the State was pursuing a major prosecution against Nicholas for racketeering and for three other first-degree felonies. Yet the prosecutor did not ask the members of the venire the most basic questions concerning whether they knew or were acquainted with Nicholas or any of the prospective witnesses. And contrary to the suggestion in the majority opinion, the trial court did not ask the venire members if they knew Tamiko James, Nicholas, or any of the prospective witnesses. Such a question by the prosecutor would not have been redundant, and the trial court did not place any limits on the parties’ voir dire examination of the members of the venire.
The majority blames the juror for impairing the State “in its ability to intelligently decide whether the juror should be challenged during voir dire.” I disagree. Unquestionably, it was the State’s lack of diligence that resulted in its failure to obtain the information that it later deemed important enough to interrupt the trial and to move to “strike” one of the jurors whom it had accepted the day before. The juror’s omission to provide the information was the direct result of the State’s lack of diligence, and the result reached by the majority is in conflict with De La Rosa. The trial court erred in granting relief to the State by removing the juror when the failure to obtain the material information was the direct result of the State’s lack of diligence. See Roberts, 814 So.2d at 343; McGough, 536 So.2d at 1189; Blaylock, 537 So.2d at 1107.
Y. WILSON AND LEBRON
The majority relies heavily on the decisions in Wilson v. State, 608 So.2d 842 (Fla. 3d DCA 1992), and Lebron v. State, 724 So.2d 1208 (Fla. 5th DCA 1998), in support of its position. Because the facts in both of these cases meet the three-part De La Rosa test, they do not support the majority’s approval of the trial court’s ruling in this case.
In Wilson, the State asked the venire members whether they could be impartial. 608 So.2d at 843. Benadette Bryan, the juror in question, did not indicate that there was a reason she could not be an impartial juror. Id. Before the second day of testimony, another juror sent the judge a note about a potential problem with Bryan. Id. Bryan had expressed “ill feelings against the State Attorney’s Office.” Id. Upon inquiry by the court, Bryan said “that the State Attorney’s Office was trying to do something to her mother that was unfair.” Id. On the State’s motion, the trial court dismissed the juror over the defendant’s objection. Id. On appeal, the Third District held that the trial court had “properly resolved the problem by replacing Bryan with an alternate juror.” Id.
In Wilson, the juror’s “ill feelings against the State Attorney’s Office” were obviously material to her service as a juror in the case. Id. The juror concealed her bias by failing to respond when asked about her ability to be impartial. And Bryan’s failure to disclose her bias was not due to any lack of diligence by the State. The State made the requisite inquiry during voir dire. Thus the Wilson court’s approval of the trial court’s ruling removing juror Bryan was based on facts that met the three-part De La Rosa test.
*318 The facts in Lebrón reveal a particularly egregious example of juror concealment. A jury found Lebrón guilty of attempted murder, robbery, and kidnapping. 724 So.2d at 1209. Lebrón moved for a new trial based on the misconduct of the jury foreperson, Kevin Wright. Id. Lebrón alleged that Wright had “failed to timely disclose to the trial court his suspicion that Mr. Lebrón had murdered his friend,” Neal Oliver. Id. Before the trial, Wright had read a newspaper account naming Le-brón as Oliver’s killer. Id. The newspaper article included pictures of both Lebrón and Oliver. Id. Lebrón was subsequently charged with the murder of Oliver. Id.
During voir dire, the trial court asked the venire generally whether they knew anything about the Oliver case. Id. The trial court also asked the venire members specifically whether they knew Lebrón. Id. None of the jurors said that they knew Lebrón, but one of the jurors said that she had known Mr. Oliver. Id. That juror was excused for cause. Id. Other jurors said that they had heard or read about the case. Id. But Wright, who was Oliver’s friend, did not inform the trial court or the parties that he knew anything about the case. Id. When defense counsel asked the venire if they knew of any reason that they could not be fair and impartial, Wright answered in the negative. Id. On the last day of trial, Wright’s fiancée told defense counsel that Wright had discussed the case with her. Id. In an interview with the trial court conducted while the jury was deliberating, Wright’s fiancée said that “Wright had told her that he thought Mr. Lebrón was guilty.” Id.
Wright’s conduct unquestionably met the three-part De La Rosa test. Wright’s friendship with the murder victim and his familiarity with newspaper accounts of the crime were obviously material to his service as a juror in the case. Wright failed to respond truthfully to direct questions designed to elicit this information. In addition to his concealment of facts material to his jury service, Wright was guilty of misconduct for discussing the matter with his fiancée while the case was still pending. Under these circumstances, the Fifth District properly reversed the trial court’s order declining to grant Lebrón a new trial. Id. at 1210.
VI. THE TRIAL COURT’S “PREDICAMENT”
The majority suggests that the State’s motion to “strike” the juror placed the trial court in “a predicament.” According to the majority, if the trial court did not remove the juror, “there would be a lingering question as to whether the juror’s pri- or knowledge and interaction with Tamiko [James] and Nicholas influenced the verdict ... regardless of whether Nicholas was convicted or acquitted.” It is difficult to know what to make of this argument. The majority seems to suggest that the trial court was obligated to disregard the merits of Nicholas’ objection to the removal of the juror and to grant the State’s motion in order to ensure that Nicholas received a fair trial.
But the trial court was not in “a predicament.” Nicholas’ counsel strenuously objected to the removal of the juror and— after an evening for research and reflection — presented several arguments in support of his objection. Counsel for Nicholas acted in accordance with a well-considered strategy to keep the juror on the jury panel. In the event of a conviction, Nicholas would have had no ground for complaint either on direct appeal or on a post-conviction motion if the trial court had sustained his objection to the removal and replacement of the juror.
Also, unlike the juror in Lebrón, the juror in this case had no knowledge of the *319 facts of the case to be tried. The juror had known Tamiko James and Nicholas in school more than a decade before the trial; his most recent contact with Tamiko James had been seven or eight years earlier. Thus the juror had no “external knowledge” of the facts of the crimes for which Nicholas was on trial. The mere fact of the juror’s remote acquaintance with Tamiko James and Nicholas did not disqualify him for service on the jury. See Bigham, 995 So.2d at 215; DuBoise, 520 So.2d at 264; Porter, 214 So.2d at 73.
VII. HARMLESS ERROR ANALYSIS
I now turn to the question of whether the error in removing the juror was harmless. “The harmless error test ... places the burden on the state, as the beneficiary of the error, to prove beyond a reasonable doubt that the error complained of did not contribute to the verdict or, alternatively stated, that there is no reasonable possibility that the error contributed to the conviction.” State v. DiGuilio, 491 So.2d 1129, 1185 (Fla.1986) (citing Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)). Thus the State has the burden on the issue of harmless error.[16]
Nicholas sustained discernible prejudice as a result of the removal of the juror. As Nicholas’ counsel pointed out in the trial court, jurors are not fungible. Nicholas is an African-American male. The removed juror was the only African-American male on the jury. The replacement juror was a white male. Nicholas had not exercised all of his allotted peremptory challenges. Nicholas might have exercised an additional peremptory challenge, but he did not. This strategy ensured that the removed juror would remain on the jury. The trial court’s ruling deprived Nicholas of the benefit of the strategy he had employed during jury selection by removing the lone African-American male from the jury.
The conclusion that Nicholas sustained prejudice as a result of the trial court’s ruling leads to the question of whether the jury would have convicted him of conspiracy to traffic in cocaine anyway. After a thorough review of the record, I believe that the State’s case on the conspiracy to traffic charge was not so strong that any reasonable jury would have returned a guilty verdict. Two facts lead me to this conclusion. First, the State’s proof was based in substantial part on the testimony of the two cooperating codefendants, De-loch and Tamiko James. Each of these men had major credibility problems. Second, the jury was unable to reach a verdict on two of the four charges against Nicholas. The charges on which the jury was unable to reach verdicts were the charges of racketeering and conspiracy to engage in racketeering. Yet the facts and the legal issues involved in the charge of conspiracy to traffic were substantially similar to the facts and the legal issues involved in the charges of racketeering and conspiracy *320 to engage in racketeering. The split in the jury’s verdicts suggests that the jury harbored doubts about Nicholas’ asserted participation in the alleged drug trafficking conspiracy. Under these circumstances, I conclude that the State has not met its burden of demonstrating harmless error. Cf. Washington, 955 So.2d at 1172-73 (holding that the improper removal of a juror from the panel is not cured by the replacement of the juror with a duly selected alternate juror).
VIII. CONCLUSION
The majority’s reasoning rests on the notion that the juror concealed information that he was never asked to provide. In effect, the majority concludes that the juror was guilty of misconduct because he was not clairvoyant. Because our jury venires are not drawn from the ranks of mediums, mentalists, and mind readers, I believe that the majority’s holding on this issue is untenable.

. The written judgment erroneously adjudicates Nicholas guilty of conspiracy to traffic *308 in cocaine on counts three and four. The reference to conspiracy to traffic in cocaine with respect to count three is apparently a scrivener’s error.

. In her preliminary remarks concerning her motion to "strike” the juror, the prosecutor also asserted "that while Tamiko James has been testifying that this particular juror has been ... making extreme eye contact *309 with members of [Nicholas’] family and every time [the assistant state attorney] looks at him he looks away.” The assistant state attorney who reportedly observed this behavior did not testify or otherwise address the court concerning her observations. Although the majority cites this allegation in support of the trial court’s decision to remove the juror, the trial court did not make any findings about the State’s eye-contact claim and did not rely on the claim in support of its ruling removing the juror.

. As noted above, two juries were selected at the trial of Nicholas' case, with the jury for Nicholas' case being the second selected. Thus the prosecutor may have become confused about what questions were actually asked during the voir dire for Nicholas' case.

. The trial court did not describe or otherwise identify the juror’s behavior that formed the basis for its finding of concealment. When defense counsel asked the trial court to elaborate on this critical ruling, it declined to do so.

. For a discussion of this issue in depth, see Hinton v. United States, 979 A.2d 663, 670-83 (D.C.2009) (en banc). My analysis in this opinion follows Hinton to some extent.

. I acknowledge that several Florida cases suggest that the substitution of a duly selected alternate juror renders any error in removing a juror from the jury panel harmless. See, e.g., Newton v. State, 178 So.2d 341, 345 (Fla. 2d DCA 1965); Lowry v. State, 963 So.2d 321, 327 (Fla. 5th DCA 2007); Ortiz v. State, 835 So.2d 1250, 1251 (Fla. 4th DCA 2003); Graham v. State, 470 So.2d 97, 98 (Fla. 1st DCA 1985); State v. Tresvant, 359 So.2d 524, 526 (Fla. 3d DCA 1978). But the statements in these cases on the harmless error issue are dicta, and in each of these cases, the removal of the juror and substitution of an alternate was authorized under rule 3.280(a). See also Washington, 955 So.2d at 1173 (“It would make little sense to conclude that it is error to reconfigure the jury panel based on nothing more than the perceived impressions a juror holds about the case,” and then conclude that “the error does no harm because the parties had previously selected the alternate juror. ... [T]he reconfiguration of the jury panel is the very error that must be corrected.”).