995 So.2d 207 (2008)
Eddie Junior BIGHAM, Appellant,
v.
STATE of Florida, Appellee.
No. SC05-245.
Supreme Court of Florida.
July 10, 2008.
Rehearing Denied November 19, 2008.
*209 Carey Haughwout, Public Defender, and Jeffrey L. Anderson, Assistant Public Defender, West Palm Beach, FL, for Appellant.
Bill McCollum, Attorney General, Tallahassee, FL, and Lisa-Marie Lerner, Assistant Attorney General, West Palm Beach, FL, for Appellee.
PER CURIAM.
This case is before the Court on appeal from a conviction of first-degree murder and a sentence of death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we reverse the first-degree murder conviction and vacate the death sentence because we conclude the evidence is insufficient to prove premeditation. However, we find that the record supports a conviction of second-degree murder, and we remand to the trial court to enter a judgment of conviction on second-degree murder and to conduct a sentencing proceeding on that conviction.

FACTS
The record reflects that Eddie Junior Bigham was indicted for first-degree murder, kidnapping, and sexual battery on July 28, 2003. Bigham's motion to suppress his statement given to police was denied by the trial court on April 15, 2004. The *210 trial began with jury selection on November 1, 2004. At the end of the State's case-in-chief, Bigham moved for judgment of acquittal on all counts, and the trial court granted a judgment of acquittal on the charges alleging kidnapping, sexual battery, and felony murder; but the trial court denied the motion as to first-degree premeditated murder and allowed that charge to be submitted to the jury. The jury returned a guilty verdict for first-degree premeditated murder, and subsequently returned an advisory recommendation for death as an appropriate penalty. On January 11, 2005, the trial court sentenced Bigham to death.
Evidence presented at trial indicated that very late on the night of May 23, 2003, Lourdes Cavazos-Blandin, a/k/a Lulu, left the apartment she shared with her husband Jose Guillermo, a/k/a Oscar, after asking her mother, Olivia Cavazos, for money for a taxi. Prior to leaving, she had eaten dinner and split a twelve-pack of beer with her husband. She also had intercourse with her husband before falling asleep. After leaving, she did not return home or call the next morning, May 24, 2003.
On the morning of May 24, 2003, Dennis Lewis discovered Lulu's body on the way to work while walking past a wooded lot. He called the police, who responded to the scene and cordoned it off to avoid contamination. Officer Hurtado testified that he noticed that the vegetation was disturbed along a path from the street to the body. Lulu's body was mostly nude, and her clothes were folded and placed over her face, chest, and genitals.
On July 1, 2003, Bigham voluntarily went with Sergeant Bill Hall and Investigator Jeffrey Hammrick to the Ft. Pierce Police Department for questioning. The interview was videotaped. At the beginning of the tape, Hall appears to be in the middle of informing Bigham of his Miranda[1] rights and asks him to sign a written waiver, which Bigham refuses. Bigham, however, did agree to continue the interview. Bigham stated that he had met Lulu at a store in Ft. Pierce in the early hours of May 24 and that he had sex with her at the home of his friend, "Lightning." Initially he stated that he had intercourse with Lulu without a condom on the floor of the bathroom of the home, and that he gave her ten dollars and she left. Shortly thereafter he left and went home without seeing her again. He denied having anal intercourse with her. However, later in the interview he stated that he saw her again and had sex with her in a wooded lot nearby. He described her as high on alcohol or drugs. He stated that he used a black condom given to him by his friend. He said the friend gave him two condoms. Bigham also stated that it was possible that he "slipped" and entered Lulu's anus during the sex in the woods. He stated that when they finished having sex in the woods he asked if she was alright and she said yes. He further stated that Lulu was standing, conscious, speaking, and getting dressed when he left her. Bigham denied choking Lulu despite persistent suggestions from his interrogators that he may have accidentally choked her during sex.
Tommy Garrason, a crime scene investigator, photographed the scene and collected the physical evidence. He described a disturbed area in the lot with branches broken and pushed apart. He also observed drag marks in the pine needles that covered the lot. He discovered a flip-flop type shoe on the street next to the lot and another in the middle of the street. He also found a black condom wrapper in the street near the lot. Garrason photographed *211 and examined Lulu's body before moving her. Near the shorts lying on her chest, he noticed a strand of hair. In total, he collected five strands of hair from under the clothing laid on her body. When he rolled the body over, he found a black condom still lodged in her anus. He was not able to retrieve fingerprints from any of the objects located or from the body itself.
Expert witness Earl Ritzline testified that he performed the DNA analysis on the samples collected. He identified two of the hairs found on Lulu's body as Bigham's. Additionally, he testified that the semen found in Lulu's vagina belonged to Bigham and that the seminal fluid found on and in the condom and the fluid wiped on the T-shirt found on Lulu's body belonged to both Bigham and Oscar, although Oscar's contribution to the stains was smaller and only on the outside of the condom. Further, he testified that the panties were stained with Lulu's urine and had traces of Oscar's semen. There was fecal matter, mixed with semen, on the T-shirt. There were small blood stains on the shirt and shorts that matched both Lulu and Bigham, and clippings from her nails had traces of DNA from both Bigham and Oscar. Ritzline testified that his findings were consistent with Lulu having had sex with Oscar first, then having got dressed, then having had sex with Bigham without dressing again and at some point having urinated while still standing upright and dressed, staining her shorts. Ritzline opined that the sex with Bigham would have naturally pushed Oscar's semen out of the vaginal cavity, thereby explaining the lack of any trace of his semen in her vagina.
Medical Examiner Charles Diggs testified that he determined Lulu's cause of death to be strangulation and that she died between the hours of 1 and 2 a.m. on May 24, 2003. He stated that death by strangulation takes minutes, but that a victim could be rendered unconscious in as little as fifteen seconds. He noted a very minor superficial wound on her face near her left eye. He collected a sexual assault kit from the body and testified that there was evidence of sexual activity, but not of physical trauma associated with the sex. Diggs also testified that he found no injuries on the body or any other physical signs of a struggle. He noted that the urine found on her shorts could have been caused by terror or fright.
The trial court ruled that this evidence was insufficient to submit to the jury on the charges of kidnapping, sexual battery, and felony murder; but the court allowed the premeditated murder charge to go to the jury. The jury convicted Bigham of premeditated murder and, after a penalty phase proceeding, recommended a sentence of death, which the trial court subsequently imposed.

ANALYSIS
In this appeal, Bigham raises seventeen guilt-phase claims and fourteen penalty-phase claims. Upon reviewing the record, we find that while the evidence is sufficient to support a finding that Bigham was responsible for the victim's death, the evidence is insufficient to demonstrate the necessary element of premeditation to sustain a conviction of premeditated first-degree murder. We find the evidence sufficient to support a conviction of second-degree murder and remand for resentencing for that crime. Our resolution of this issue renders Bigham's penalty-phase claims moot.

Sufficiency of Evidence
In his first two issues, Bigham first asserts that the proof was insufficient to prove he was responsible for Lulu's death, and next asserts that he could not be *212 found guilty of first-degree murder because the proof of premeditation was insufficient.
At trial, Bigham's theory of innocence was that someone else killed Lulu, perhaps her husband, Oscar, because of his disapproval of her drug use and promiscuity. Bigham maintained in his statement that she was alive when he left her. However, the State offered proof that Oscar stayed home the night of Lulu's death and did not leave until she had already been killed. More importantly, the State's evidence, including that of the medical examiner, indicated that Lulu was not likely to have moved after Bigham had intercourse with her in the woods, because she did not remove the condom from her anus, his hairs were on her body, and a mixture of his semen and her fecal matter was on the shirt that lay on top of her when she was found. From this evidence, the jury could infer that Lulu died during or immediately after her sexual activity with Bigham in the woods. Bigham's conflicting accounts of his encounters with Lulu also provided the jury with a basis for concluding that, coupled with the DNA evidence, Bigham was not being truthful in asserting that she was up, alive and getting dressed when he left her. The presence of the condom used by Bigham still in her body is hardly consistent with his account. Further, where the physical evidence is considered together with the numerous conflicts and contradictions in Bigham's account of his encounter with the victim, we conclude that a reasonable jury could find that he was responsible for her death. Hence, we conclude the proof was sufficient to demonstrate Bigham's involvement in her death.
However, even viewing the facts in the light most favorable to the State, we conclude the State's evidence was not sufficient to prove that Lulu's death was caused by premeditated murder. In Green v. State, 715 So.2d 940, 943-44 (Fla. 1998) (quoting Coolen v. State, 696 So.2d 738, 741 (1997)), we explained:
Premeditation is the essential element that distinguishes first-degree murder from second-degree murder. Coolen v. State, 696 So.2d 738, 741 (Fla.1997). Premeditation is defined as
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose to kill may be formed a moment before the act but must also exist for a sufficient length of time to permit reflection as to the nature of the act to be committed and the probable result of that act.
"Where the State's proof fails to exclude a reasonable hypothesis that the homicide occurred other than by premeditated design, a verdict of first-degree murder cannot be sustained." Id. at 944.
While we find that the evidence was sufficient to rule out any hypothesis but that Bigham caused Lulu's death, we do not find that the evidence was sufficient to prove that Bigham had the conscious purpose to kill Lulu that we held in Green was required. The record is devoid of evidence from which it can be inferred that Bigham intended to kill Lulu or desired for her to die.
In Green we reduced a first-degree murder conviction involving a death by manual strangulation under circumstances somewhat similar to those involved herein. We concluded in Green that the proof of the defendant's guilt of premeditated murder by circumstantial evidence was insufficient. We described the facts in Green in a light most favorable to the State:
Kulick's body was found on Masterpiece Gardens Road in Polk County, Florida, at approximately 3:30 a.m. on May 22. The only apparel worn by Kulick *213 was a pair of shoes. Here body had been dragged from the side of the road and displayed in the middle of the intersection with her legs spread apart. Her body exhibited evidence of stab wounds and blunt trauma, but the cause of death was manual strangulation. At the time of her death, Kulick's blood alcohol level was .106.
....
We find that the record in this case supports the reasonable hypothesis that Kulick's murder was committed without any premeditated design. On the night of the murder, Kulick was intoxicated and had a heated argument with Gulledge, her former boyfriend and employer. Kulick was arrested and charged with disorderly conduct and resisting arrest. She was angry and intoxicated upon her release from custody, as indicated by her blood alcohol level at the time of her death. Gay testified that Green confessed that he and a friend picked Kulick up in front of the jail and "did things" to her. Green related to Gay that "the bitch got crazy" and he and his friend killed her. There were no witnesses to the events immediately preceding the homicide. Although Kulick had been stabbed three times, no weapon was recovered and there was no testimony regarding Green's possession of a knife.
715 So.2d at 941-44. While the facts in Green were arguably stronger than those presented here, we nevertheless concluded: "[T]here was little, if any, evidence that Green committed the homicide according to a preconceived plan." Green, 715 So.2d at 944.
Prior to Green, and in a case that also involved a death by strangulation, we concluded that the evidence of premeditation was insufficient despite evidence that the strangled victim was found partially nude and the defendant had a history of strangling women while raping them. Hoefert v. State, 617 So.2d 1046 (Fla.1993). Subsequently, we found insufficient evidence of premeditation in two strangulation murders in Randall v. State, 760 So.2d 892 (Fla.2000). In Randall, we relied upon our earlier decision in Kirkland v. State, 684 So.2d 732 (Fla.1996), also holding that evidence of premeditation was lacking in a strangulation case. Randall, 760 So.2d at 902. Hence, we have concluded in a number of cases that evidence of premeditation was insufficient even though the defendant had killed the victim by strangulation.
We conclude the same result is required here where, arguably, the proof of premeditation is even less than the proof in these previous cases, and where here the trial court has directed a judgment of acquittal on the charges of sexual battery and kidnapping. Nevertheless, as in Hoefert and the other strangulation cases discussed above, we find the evidence of strangulation sufficient to sustain a conviction for second-degree murder, which requires the finding of an "act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual." Hoefert, 617 So.2d at 1050 (quoting § 782.04(2), Fla. Stat. (1987)).

State's Alleged Improper Argument
Next, Bigham argues that it was improper for the prosecution to argue in closing that Bigham had sexually violated the victim. Bigham points out that the trial court had granted a judgment of acquittal for that crime.
The prosecution asserted during its closing that Bigham had killed Lulu at the same time that he was having sex with her in the woods:
Ms. Park: ... He pulled off the shorts inside out and the panties, [Lulu] *214 is no longer fighting. He puts on the black condom. He then sexually assaulted her vaginally, anally, she's no longer fighting. She's dead.
Mr. Unruh: Objection, Judge....
....
... We have the State arguing a sexual assault occurred, there are only felony murder. (sic) They brought it up during my closing, the Court previously ruled on these things....
....
Ms. Park: At the point where he is wearing a black condom and having sex with her, she's no longer fighting, she's dead. There are no signs of trauma, no signs of tearing, she's not struggling any longer. You wouldn't expect to see that....
Mr. Unruh: Object, Your Honor, facts not in evidence....
....
... The State has commented on things that were not in evidence. No expert testified that she was dead at the time of the sexual act. There was no direct evidence by any expert witness of that. They are commenting on things that are not in evidence.
The Court: That's their theory. Overrule the objection.
Because the trial court overruled the objection, our first task is to determine whether the argument was improper. If the argument was improper, we must then determine if the error was harmless beyond a reasonable doubt. See Muhammad v. State, 782 So.2d 343, 360 (Fla.2001) (citing State v. DiGuilio, 491 So.2d 1129 (Fla.1986)).
In determining whether an error is harmless, the court must determine beyond a reasonable doubt that the comment did not contribute to the guilty verdict. Further, in making this determination, the burden is on the State, as the beneficiary of the error, to demonstrate that the error complained of did not contribute to the verdict. DiGuilio, 491 So.2d at 1135.
We have long held that argument on matters outside the evidence is improper. See Pope v. Wainwright, 496 So.2d 798, 803 (Fla.1986). Even though the trial court had granted a judgment of acquittal on the charge of sexual battery, the trial court overruled the objection on the basis that it was the State's theory that Lulu was probably dead at the time the sex act occurred. We agree that the State's theory could be inferred from evidence that suggested that the death by strangulation could have occurred at virtually the same time that the sexual relations took place. Therefore, the prosecutor's argument does not appear to have been improper. In other words, we agree with the trial court that the State was doing little more than stating its theory of the case that the choking of the victim by Bigham took place at virtually the same time as the sex.
Even if the comments were improper, and the trial court should have sustained the objection, we find that there is no reasonable possibility the comments complained of could have contributed to the verdict. DiGuilio, 491 So.2d at 1135; cf. Muhammad, 782 So.2d at 360 (holding the prosecutor went beyond simply commenting on the evidence and the record as a whole showed there was no reasonable possibility that the improper argument contributed to the jury's guilty verdict). Accordingly, Bigham is not entitled to a new trial based upon this claim.

Denial of Bigham's Arguments
Bigham next alleges the court abused its discretion by forbidding him to argue the State failed to prove the two counts of sexual battery and kidnapping it had already dismissed via the judgment of *215 acquittal. Here, the trial court instructed the jury that the only charge remaining for the jury to decide was the charge of first-degree premeditated murder and that the jury should only concern itself with that charge.
It is within the trial judge's discretion to determine when an attorney's argument is improper, and such determination will not be upset absent abuse of discretion by lower court judge. Watson v. State, 651 So.2d 1159, 1163 (Fla.1994). We agree that after the trial court's dismissal of those charges, the counts of sexual battery and kidnapping were no longer germane to the jury's consideration and were properly restricted from closing argument by the trial judge.

Juror Challenge
Bigham next alleges that the trial court improperly allowed a juror to remain on the panel after the juror informed the court he recognized one of the State's witnesses once testimony began. Bigham claims he is entitled to a new trial because this juror concealed material information.
The trial court conducted a full inquiry of the juror's contact with the witness. On the record it appears that the juror's failure to disclose his knowledge of a State witness was not material. See De La Rosa v. Zequeira, 659 So.2d 239 (Fla.1995). Rather, the record reflects that his familiarity with the State's witness was casual and distant. On his own initiative, the juror stated that he did not know a police detective's last name, but recognized him as someone who had been a past acquaintance. He explained that he worked security at a bar that the detective frequented five to seven years prior to the trial. He further explained that any conversation between the two had been brief and did not reflect the detective's work. Secondly, the juror did not attempt to conceal the information and came forward as soon as it was apparent that he did, in fact, recognize the officer. Finally, the juror answered the question posed during voir dire correctly, because he was actually asked if he was related to or close friends with any law enforcement officers, and even given his passing acquaintance with Hall, there was no evidence that he was related to or close friends with him. We find no error in the trial court's resolution of this issue.

Expert Testimony
Bigham next argues that the trial court improperly admitted expert testimony. We find there was no error.
In the present case, Earl Ritzline was called as a State expert witness for DNA analysis. He was properly qualified as an expert before the court and jury in questioning by the State. During his testimony regarding biological fluids found on the T-shirt laid on top of the victim's body, Ritzline stated that the stains were a combination of Bigham's fluids and Oscar's fluids. To clarify, he was asked if he was talking about the same wipe on the shirt. Later, he was asked to explain how one stain could include contributions from both men. Experts are allowed to give opinion testimony based on facts that the expert personally observed, even if those facts are not admissible themselves. § 90.704, Fla. Stat. (2005). Here, an expert on DNA analysis provided the jury with his explanation of the presence of biological fluids. The opinions given were subject to cross-examination, and their credibility could be weighed by the jury. Bigham has not demonstrated that the opinions given by the expert were outside the scope of his expertise or factual observations. Accordingly, the trial court did not commit error in allowing this testimony.

Voir Dire
Bigham next argues that the trial court improperly allowed the State, over objection, *216 to assert during voir dire that the State did not seek the death penalty in all cases. We have examined the record and the context in which the statement was made, and we find there was no error. We note that, in essence, the statement was made as a predicate for the State to ascertain a potential juror's ability to apply the law in a case where the State was seeking the death penalty. The statement was not made in the context of any assertion that the penalty was appropriate in this case because the prosecutor was selective. Furthermore, the juror questioned did not serve on the jury. Accordingly, we find no abuse of discretion by the trial court.

Absence From Conferences
Bigham next argues that his absence from certain pretrial conferences violated his right to a fair trial. However, he makes no attempt to demonstrate prejudice or to otherwise demonstrate that anything substantive took place at the hearings. The State notes the incidents were hearings for the defense's motions to continue and a status conference where defense counsel spoke to Bigham, who waived his right to appear, just prior to appearing. No objections by the defense to the proceedings were ever lodged in the trial court. This Court has held that although adherence to the rule requiring a waiver of defendant's appearance has not always been followed, a defendant may nonetheless waive his right to appear either through trial counsel or by later acquiescence to the outcome of the missed portion. Muhammad v. State, 782 So.2d 343 (Fla.2001); see also Wike v. State, 813 So.2d 12 (Fla.2002). While the State admits that these waivers were not in writing, it argues that the conferences were not critical and that Bigham did not preserve the issue because he appeared before the same judge shortly thereafter without raising an objection to his absence from previous conferences. We agree and find that any possible error was harmless under these circumstances.

Improper Testimony
Bigham argues that the State improperly solicited speculation from its witness, Mrs. Cavazos, as to when Lulu's husband Oscar left his apartment. The State argues that Mrs. Cavazos' testimony was lay opinion testimony and, as such, was properly admitted under section 90.701, Florida Statutes. Section 90.701 requires a two-prong test of lay opinion testimony:
(1) The witness cannot readily, and with equal accuracy and adequacy, communicate what he or she has perceived to the trier of fact without testifying in terms of inferences or opinions and the witness's use of inferences or opinions will not mislead the trier of fact to the prejudice of the objecting party; and
(2) The opinions and inferences do not require a special knowledge, skill, experience, or training.
§ 90.701, Fla. Stat. (2005). We agree with the State that Mrs. Cavazos' testimony was admissible under this rule. We also agree that her opinion was subject to being challenged on cross-examination with its ultimate credibility left to the jury.
We have also considered but also reject Bigham's contention that the trial court improperly admitted other hearsay testimony through Mrs. Cavazos, Oscar, and Officer Hammrick. We agree with the State that this evidence was either invited by questioning by the defense or that the admission of any such testimony was harmless.

Juror Excused
Bigham next argues that the trial court improperly allowed the State to excuse a potential juror for cause. A potential *217 juror may be excused "for cause" on a number of grounds, including that the juror has a state of mind regarding the case "that will prevent the juror from acting with impartiality." § 913.03(10), Fla. Stat. (2005). Excusal for cause is justified if reasonable doubt exists whether the juror can be impartial. Ault v. State, 866 So.2d 674, 683 (Fla.2003). An individual may not serve as a juror in a capital case if his or her views on the death penalty "prevent or substantially impair the performance of his or her duties as a juror in accordance with the juror's instructions or oath." Fernandez v. State, 730 So.2d 277, 281 (Fla. 1999).
In this case the juror in question declared during voir dire that as a Christian she could not sit in judgment of anyone. She also answered affirmatively the question of whether her experience would prevent her from being fair and impartial. She further stated that she would prefer to recommend life and only that she would try to follow the law. Although the juror later seemed to qualify her prior statements and suggested she could be impartial and follow the law, we conclude there was enough hesitation and equivocation for the trial court to exercise its discretion and allow the State to challenge her for cause.

Suppression of Bigham's Statement
Bigham argues that his statement to the police should have been suppressed because he was never notified of his right to an attorney before he was questioned. He relied substantially on a record of the statement which contains only a partial account of the Miranda warnings. However, the trial court held a full evidentiary hearing on the motion where both police officers present during the videotaped statement testified that Detective Hall fully and properly read Bigham his Miranda rights, including his right to counsel. The trial court was entitled to rely on this testimony to resolve any confusion in the transcript. Accordingly, we find no error in the trial court's denial of Bigham's motion to suppress.

Jury Dispersed
Bigham argues that the trial court erred in not sequestering the jury and allowing the jurors to go home for the night during deliberations. However, the record shows that the trial court asked both defense counsel and the prosecution how they wanted to proceed with the jury during deliberations and that the defense agreed the jurors could go home:
THE COURT: It's a little after five o'clock and I understand that we have agreed thatI'll ask the Jury if they are about to reach a verdict, in which case we'll wait. Otherwise, I understand everybody has agreed we can send them home for the night.
MR. AKINS: That's fine
THE COURT: Okay with the State?
MS. PARK: Yes, sir
THE COURT: Okay with the defendant?
MR. AKINS: Yes, sir.
....
THE COURT: ... Okay. The defendant is present. What do you want to do?
MR. HARLLEE: I kind of like the approach you did yesterday, see if they are close or way apart and take it from there.
THE COURT: Send a note in or bring them out?
MR. HARLLEE: Note, please. You want to do the honors?
MS. PARK: What's this one going to say?
MR. HARLLEE: What did you say yesterday?

*218 MS. PARK: He didn't, he called them out.
THE COURT: If you're close to reaching a verdict, we'll stay and wait for you; if not, we'll break until Friday morning.
MR. HARLLEE: Okay. Sounds good.
MS. PARK: You're close to reaching a verdict, we'll wait for you, otherwise
MR. HARLLEE: We'll break at five.
THE COURT: Break at five and come back Friday morning.
MR. UNRUH: That's fine.
Because the record clearly demonstrates that Bigham agreed that the jurors could be released, we find no reversible error.

Jury Instructions
Finally, Bigham's contention that the jury instructions given on first-degree murder were inadequate is now a moot issue in view of our reduction of the conviction to second-degree murder.

CONCLUSION
When the State has presented sufficient evidence to establish the guilt of one accused of a serious crime, it is the responsibility of the courts to acknowledge that evidence. However, it is equally the duty of the courts to ensure that the State is held to its burden of proof when someone is charged with a serious crime and liberty and life are at risk.
Ballard v. State, 923 So.2d 475, 485 (Fla. 2006). As noted above, our discussion of the evidence compels us to conclude that while the State has submitted sufficient evidence of Bigham's guilt of second-degree murder, there was insufficient evidence of premeditation. Accordingly, we reverse Bigham's conviction for first-degree murder and vacate his death sentence and remand this case to the trial court with instructions to enter a judgment for second-degree murder and to sentence Bigham accordingly.
It is so ordered.
WELLS, ANSTEAD, PARIENTE, LEWIS, and CANTERO, JJ., concur.
QUINCE, C.J., concurs in part and dissents in part with an opinion.
BELL, J., dissents with an opinion.
QUINCE, C.J., concurring in part and dissenting in part.
While I agree with the majority that the evidence in this case does not support the first-degree murder conviction under the theory of premeditation, I dissent because I believe that under these facts the first-degree murder conviction cannot be reduced to second-degree murder. In addition to being charged with first-degree premeditated murder, Bigham was also charged with kidnapping, sexual battery, and felony murder. The trial judge found the evidence insufficient to submit the kidnapping, sexual battery, and felony murder charges to the jury. Thus, Bigham was effectively acquitted on these three charges.
In order to find a defendant guilty of second-degree murder, the murder must have been committed while the defendant was a participant in one of the felonies enumerated in section 782.04(3), Florida Statutes, and the actual killing was done by someone other than the person engaged in committing the felony or, as defined in section 782.04(2), the murder was committed during the course of an act that was imminently dangerous to another and evincing a depraved mind. Since the defendant was acquitted on the felony charges and we have no evidence that the death occurred by the act of another, Bigham cannot be convicted of second-degree murder under 782.04(3).
*219 I also conclude that the facts do not support the taking of a life by an act that is imminently dangerous and evincing a depraved mind. While the majority reduces this case to second-degree murder because the victim was strangled, I cannot conclude beyond a reasonable doubt that Bigham was the person who strangled the victim. The evidence in this case indicates that Bigham had sex with the victim on the night of the murder. The medical examiner testified that while there was sexual activity there was no trauma. There were no injuries to the body or signs of a struggle. In addition, Bigham made inconsistent statements to law enforcement concerning his involvement with the victim. This evidence does not support a finding that Bigham strangled the victim.
Therefore, I do not agree that the evidence supports a conviction for second-degree murder.
BELL, J., dissenting.
Unlike the majority, I would uphold Bigham's conviction for first-degree premeditated murder. The circumstantial evidence in this case, when viewed in the light most favorable to the jury's verdict, is sufficient to support premeditation. Moreover, the State's case excluded every identifiable, reasonable hypothesis other than premeditation.
As this Court has explained, premeditation is
more than a mere intent to kill; it is a fully formed conscious purpose to kill. This purpose may be formed a moment before the act but must exist for a sufficient length of time to permit reflection as the nature of the act to be committed and the probable result of that act.
Carpenter v. State, 785 So.2d 1182, 1196 (Fla.2001) (quoting Norton v. State, 709 So.2d 87, 92 (Fla.1997)). "Evidence from which premeditation may be inferred includes such matters as the nature of the weapon used, the presence or absence of adequate provocation, previous difficulties between the parties, the manner in which the homicide was committed, and the nature and manner of the wounds inflicted." Id. (quoting Holton v. State, 573 So.2d 284, 289 (Fla.1990)).
Where the State seeks to establish premeditation by circumstantial evidence, "the evidence relied upon by the State must be inconsistent with every other reasonable inference." Hoefert v. State, 617 So.2d 1046, 1048 (Fla. 1993) (quoting Cochran v. State, 547 So.2d at 930). And where the State's proof fails to exclude a reasonable hypothesis that the homicide occurred without premeditation, a verdict of first-degree premeditated murder cannot be sustained. Id. (citing Hall v. State, 403 So.2d 1319 (Fla.1981)); see also Randall v. State, 760 So.2d 892, 902 (Fla.2000) (reversing the defendant's conviction for first-degree premeditated murder where there was a reasonable hypothesis that "Randall intended for his choking behavior to lead only to sexual gratification, not to the deaths of his sexual partners," which was supported by evidence of the defendant's history of choking women to heighten sexual arousal); Green v. State, 715 So.2d 940, 944 (Fla.1998) (reversing the defendant's first-degree murder conviction because there was "strong evidence militating against a finding of premeditation," including that the defendant had a heated argument with the victim which resulted in the victim's arrest, that the victim had a high blood alcohol level at the time the defendant and his friend picked up the victim from the jail, that the defendant's friend "did things" to the victim that made her "crazy," and that the defendant's intelligence was exceedingly low).
However, "`[t]he question of whether the evidence fails to exclude all reasonable *220 hypotheses is for the jury to determine, and where there is substantial, competent evidence to support the jury verdict,' reversal is not required." Delgado v. State, 948 So.2d 681, 690 (Fla.2006) (quoting Darling v. State, 808 So.2d 145, 155 (Fla. 2002)), cert. denied, ___ U.S. ___, 127 S.Ct. 3016, 169 L.Ed.2d 738 (2007). "In addition, the State is not required to `rebut every possible variation of events,' but only to present evidence that is inconsistent with the defendant's reasonable hypothesis." Id. (quoting Darling, 808 So.2d at 156). Importantly, the State "is entitled to a view of any conflicting evidence in the light most favorable to the jury's verdict." Cochran v. State, 547 So.2d 928, 930 (Fla. 1989); see also Hoefert, 617 So.2d at 1049.
The circumstantial evidence in this case, when viewed in the light most favorable to the jury's verdict, is sufficient to support premeditation. Specifically, the victim was found lying on her back with her genitalia and upper torso covered. Her clothes, which were found folded on top of her naked body, contained traces of the defendant's semen, the victim's urine (perhaps caused by terror or fright), and fecal matter. A condomcontaining the defendant's semenwas still lodged in the victim's anus. Nearby, there was a disturbed area in a vacant lot covered by pine needles where drag marks led toward the body. About twenty yards from the victim's body, on the shoulder of North 26th Street, was a condom wrapper. Additionally, the police found one flip-flop shoe in the middle of North 26th Street and the other flip-flop shoe next to the lot. There was a minor abrasion close to the victim's left temple, which could have been caused by striking or banging of the victim's head against something hard, that was inflicted around the time of the victim's death. However, there was no evidence of physical trauma associated with the sexual activity. And it is undisputed that the cause of death was manual strangulation, a process that generally takes several minutes.
Viewed in the light most favorable to the jury's verdict, this evidence clearly supports the State's hypothesis that Bigham assaulted the victim on the road, dragged her into the woods, strangled her, had vaginal and anal sex with her, wiped himself with the victim's clothes, laid her clothes on top of her body, and fled the scene.
Unlike Green, Hoefert, and Randall, there is no alternative, reasonable hypothesis that the victim in this case was killed without premeditation. Death during a struggle was not a reasonable hypothesis because the evidence shows little, if any, resistance. Further, while death during masochistic sex might have been a viable hypothesis, Bigham firmly denied that he had ever strangled the victim for sexual pleasure or excitement. In essence, the majority does not identify and Bigham has not offered any hypothesis that is reasonably inconsistent with the jury's verdict of premeditated murder.
In light of the above, I would uphold Bigham's conviction for first-degree premeditated murder. There is competent, substantial evidence to support the jury's finding that Bigham had a fully formed conscious purpose to kill. The evidence excludes any other reasonable hypothesis. Thus, we should respect the jury's verdict.
Accordingly, I respectfully dissent.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).