PER CURIAM.
Cecil Shyron King, who was forty years old at the time of the crime, appeals his conviction and sentence of death for the December 2009 first-degree murder of eighty-two-year-old Renie Telzer-Bain. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const: For the reasons set forth below, we affirm King’s conviction and sentence of death.
FACTS AND PROCEDURAL HISTORY
The Guilt Phase
Renie Telzer-Bain’s family last saw her alive on Monday, December 28, 2009, at 5:30 p.m., when her daughter-in-law, Lyza Telzer, along with Lyza’s son and Lyza’s son’s friend, visited her. Lyza and Renie were very close, spoke multiple times .per day, and saw each other five times per week. Lyza made a point of seeing Renie very often because of Renie’s age and because Renie lived by herself. Renie liked to stay up late watching television and to sleep in until 10 or 11 a.m.
The next day, Tuesday, December 29, Lyza began trying to reach Renie around 4 p.m. As the day progressed and she had not been able to reach Renie, Lyza became concerned. She called Renie’s neighbor to ask if he would keep an eye out for Renie. The neighbor had noticed that Renie’s garage door was open at 10:30 a.m. that morning and that her car was missing. He believed at the time that Renie had inadvertently left the garage door open, and either he or his wife closed it.
Lyza went to Renie’s house around 7 p.m., along with Renie’s neighbor. The garage door was closed, and when Lyza opened the garage, Renie’s car, a 2001 Cadillac, was missing. The door from the house to the garage was locked, which was unusual because Renie only locked that door at night. The neighbor pried open the door, and they entered the house. Upon entering the house, Lyza believed a burglary occurred — the house was ransacked, and Renie was an extremely neat, *680 meticulous person who always kept her house in order. Lyza and the neighbor then discovered Renie’s body in the bedroom on the floor.
The sliding glass door was opened about an inch, and the frame was damaged. The pole that normally kept the door from being opened was not in the door. Numerous items were missing from the house, including a flat screen television, silverware, jewelry, wallets, clothing, purses, cosmetic bags, a tool chest, and weekly and monthly planners with Renie’s handwriting in them. Subsequent investigation by law enforcement revealed no fingerprints of value in the house.
Investigators found a container of cantaloupe on the kitchen table. On the top of the container was a piece of fruit that appeared to have a bite mark, which was swabbed for DNA. Lyza testified that Re-nie often kept cantaloupe or fruit in containers in the fridge. The DNA swab from the fruit revealed a partial male DNA profile (with eleven of thirteen loci being identifiable).
Shoe prints were discovered on the exterior garage door, where it appeared that someone had tried to kick the door in. Additional shoe prints were found near the entry where the yard was fenced in. The size of the prints indicated a large-sized shoe.
Dr. Rao, a medical examiner, testified that the cause of death was blunt head trauma. The victim had been struck at least seventeen times with the head and claw of a hammer, sustaining injuries on the back of her head, to the front of her neck, on the. back of her neck, on her upper back, on the back of her right hand, on her right leg, and on her left knee. Three of the blows were to the head, which would have been fatal and rendered the victim unconscious. The wounds on the victim’s right hand and left arm were defensive wounds, sustained as the victim was trying to ward off blows.
The missing Cadillac was found the day after Renie’s body was discovered, located within a few blocks of King’s apartment. Fingerprints found inside the car matched those of Rashad Montford, King’s cousin. Police subsequently interviewed Montford, who explained that he borrowed the car from King. According to Montford, he went to King’s apartment in late December 2009, and King offered to let him borrow a newer model Cadillac, which was parked around the corner. King did not explain where he had gotten the car, and Montford did not ask. Montford borrowed the car twice that day. While he was borrowing the car, Montford called King at one point to tell him that he was going to be out with the car for a little while longer. Police corroborated this call using phone records. King instructed Montford to leave the vehicle a few blocks away from where King lived when he returned it.
While he was speaking with police, Montford offered to wear a recording device and visit King to get him to talk about the vehicle, with the aim of clearing Mont-ford’s name. Montford visited King twice while wearing the recording device, but King did not admit that he had given Montford the car. King instructed Mont-ford to “say you don’t know” when questioned by police about the vehicle. King’s fingerprints were not found inside the Cadillac.
James Roman testified that he was the owner of a residential lawn service company that had serviced Renie’s yard for four or five years. King worked for Roman from July until October 2009. Roman and King cut Renie’s yard together eight or ten times. Roman always went with King to cut Renie’s yard. King did not have a vehicle, so Roman would sometimes give *681 him a ride. Roman made it a point not to go inside his clients’ residences, and Roman testified that King never went inside Renie’s house. Roman does not believe that King ever met Renie. Renie never came outside to give them food or drinks, and she paid Roman by leaving a check under the door mat.
Roman was out of town at the time of the murder. While out of town, he received a phone call from King, who mentioned that something had happened to one of the clients for whom Roman worked. King usually only called Roman to speak about work.
On January 8, 2010, King pawned a gold bracelet, identified as belonging to Renie, for $300. The bracelet did not have any unique identifiers, such as charms or initials. The lead detective testified that it would be a good item to pawn if King was trying to stay under the radar.
During the investigation, police checked the phone records for King’s cell phone. On the morning of the murder, he made a phone call at 5:24 a.m. The phone call was routed using a tower that was near the bus station downtown, three miles away from his residence. Normally a phone call bounces off the cell tower that is closest to the person making the call. If King was home at the time of the phone call, there was a high likelihood that the phone call would have routed through a different tower. No other calls were made until 10:10 a.m., and that phone call routed through a tower that was closer to King’s residence. Police went to the bus station and determined that there was a bus route that left the station and stopped directly across from the entrance to Renie’s subdivision. On the day of the murder, there was a bus leaving the bus station on that route at 5:25 a.m. The bus driver confirmed that the bus ran on schedule on that particular day, but stated that he would be unable to identify King because it was rush hour.
Police executed a warrant on King and searched his residence on February 1, 2010. Numerous items belonging to Renie were found in his residence. The items included a pillow case sham that matched a sham seen at Renie’s residence, day planners with Renie’s handwriting inside, items of clothing with the tags still on them, silverware, a chess set, purses, watches, rings, pearls, necklaces, and other jewelry. Police also found a hammer on top of King’s microwave; however, the hammer did not have any blood on it. Large-sized shoes were recovered from King’s house, but none of the shoes matched the tread found in the shoe prints at the crime scene.[1]
Police interviewed King twice, but he did not admit guilt. During the first interview, King stated that he bought the pawned bracelet for $50 from a guy known as “Budha,” who hung out in his neighborhood. King was going to give the bracelet to his girlfriend, but he needed cash to catch up on bills. King denied having a Cadillac or lending the keys to anyone. He stated that he had worked with Roman on mowing Renie’s yard, but he did not really speak to her and had never been inside her house.
When questioned about the items found in his apartment, King stated that he found them in a vacant apartment near his apartment, took them home, and put them in his closet. He did not know to whom the items belonged. King stated that he looked in the vacant apartment because his apartment had been broken into and bur *682 glars were known to stash items in the nearby vacant apartment complexes. He stated that he found his stolen property in the vacant apartment as well. He had filed a police report on December 3, 2009, regarding a burglary of his home.
Police took a sample of King’s DNA. The DNA on the melon at Renie’s home was found to match that of King. The DNA on the fruit would match only 1 in 440 trillion Caucasians, 1 in 770 trillion African-Americans, and 1 in 280 trillion southeastern Hispanics.
After the DNA on the melon in Renie’s house was identified as matching King’s DNA, the police questioned him a second time on February 5, 2010. King again stated that he had never been inside Re-nie’s house and never took money from her; she always paid Roman for the lawn care services. He then subsequently stated upon further questioning that he had previously been inside Renie’s living room when he had stepped inside her house to speak to her, which was contrary to his earlier statements. When King was shown a picture of the fruit from the crime scene, he stated that Renie had previously given fruit to him and Roman. When asked why his DNA was found on the fruit, King stated that the victim served them fruit when they were previously at her house.
The jury convicted King of first-degree murder (both premeditated and felony murder), burglary, grand theft of an automobile, dealing in stolen property, and false verification of ownership on a pawn broker transaction form.
The Penalty Phase
During the penalty phase, the State presented victim impact testimony from Re-nie’s family and friends. King presented mitigation testimony from family members and friends, who testified that he was an articulate, intelligent, and caring individual. His parents divorced when he was young, after which he and his mother moved to Orlando. He was very close with his mother, who died of breast cancer. King took care of his mother in her final days, and her death impacted him greatly. He cared for his grandmother when she had Alzheimer’s disease, including bathing her, clothing her, and feeding her. When his aunt broke her hip in 2009, he visited and consoled her. King has a three-year-old son, with whom he is very close and has a good relationship. King went to church when he lived with his mother in Orlando and considered seminary at one point. According to one family member, King would have made a good minister. His family members would visit him if he was sentenced to life in prison.
The jury recommended death by a vote of eight to four. Subsequently, the trial court held a Spencer[2] hearing, at which King presented two witnesses. The first witness was his former girlfriend, who testified that he was a nice, articulate, funny, and smart individual; that he had a very good relationship with his mom prior to her death; and that it was very hard for him when she passed away. The second witness was a correctional officer who testified that in the year that King had been on his block in prison, the officer did not have any trouble with King.
The trial court followed the jury’s recommendation and sentenced King to death. The trial court found the following aggravating circumstances: (1) the capital felony was committed while the defendant was engaged in the commission of a burglary and for the purpose of pecuniary gain (merged); and (2) the capital felony was especially heinous, atrocious, or cruel *683 (HAC). The trial court gave both aggravating circumstances great weight. The trial court found no statutory mitigating factors, but found numerous nonstatutory mitigating factors.[3] The trial court found that two mitigating factors were not established: (1) the incident at issue was situational; and (2) the defendant had a lack or deficiency of positive role models.
ANALYSIS
On appeal, . King raises five claims, all of which are related only to the penalty phase: (1) the trial court erred in instructing the jury on and in finding HAC; (2) his sentence of death is disproportionate; (3) the trial court erred in allowing the prosecutor to make improper closing arguments about an avoid-arrest aggravator not submitted to the jury or found by the trial court; (4) the trial court erred in prohibiting defense counsel from making the proper argument that King had no history of violent crime; and (5) his death sentence is unconstitutional in violation of Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). In addition to the issues raised by King, this Court must consider whether the evidence was sufficient to support the conviction for first-degree murder. We address each issue in turn.
I. HAC
In his first claim on appeal, King contends that the trial court erred in finding HAC. “The standard of review this Court applies to a claim regarding the sufficiency of the evidence to support an aggravating circumstance is that of competent, substantial evidence.” Guardado v. State, 965 So.2d 108, 115 (Fla.2007). “When reviewing a trial court’s finding of an aggravator, ‘it is not this Court’s function to reweigh the evidence to determine whether the State proved each aggravating circumstance beyond a reasonable doubt — that is the trial court’s job.’” Aguirre-Jarquin v. State, 9 So.3d 593, 608 (Fla.2009) (quoting Willacy v. State, 696 So.2d 693, 695 (Fla.1997)). Rather, it is this Court’s task on appeal “to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance, arid, if so, whether competent substantial evidence supports its finding.” Id. (quoting Willacy, 696 So.2d at 695).
This Court has explained the HAC aggravator as follows:
*684 It is our interpretation that heinous means extremely wicked or shockingly evil; that atrocious means outrageously wicked and vile; and, that cruel means designed to inflict a high degree of pain with utter indifference to, or even enjoyment of, the suffering of others. What is intended to be included are those capital crimes where the actual commission of the capital felony was accompanied by such additional acts as to set the crime apart from the norm of capital felonies— the conscienceless or pitiless crime which is unnecessarily torturous to the victim.
Hernandez v. State, 4 So.3d 642, 668-69 (Fla.2009) (quoting State v. Dixon, 283 So.2d 1, 9 (Fla.1973)). Further, “the HAC aggravator focuses on the means and manner in which death is inflicted and the immediate circumstances surrounding the death.” Id. at 669 (quoting Brown v. State, 721 So.2d 274, 277 (Fla.1998)).
“This Court has consistently upheld HAC in beating deaths.” Douglas v. State, 878 So.2d 1246, 1261 (Fla.2004) (quoting Lawrence v. State, 698 So.2d 1219, 1222 (Fla.1997)); see, e.g., Dennis v. State, 817 So.2d 741, 766 (Fla.2002) (upholding HAC where both victims suffered skull fractures and were conscious for at least part of the attack, as evidenced by defensive wounds to their hands and forearms); Bogle v. State, 655 So.2d 1103, 1109 (Fla.1995) (upholding HAC where the victim was struck seven times on the head, the victim was alive during the infliction of most of the wounds, and the last blows caused death). However, in order to support a finding of this aggravator, “the evidence must show that the victim was conscious and aware of impending death.” Douglas, 878 So.2d at 1261.
The existence of defensive wounds is relevant to the HAC analysis. This Court has “affirmed findings of HAC where defensive wounds revealed awareness of impending death.” Guardado, 965 So.2d at 116 (upholding HAC where the victim was beaten, stabbed repeatedly, and her throat was slashed, because the evidence of defensive wounds to the victim’s right hand indicated that the victim was conscious enough during the attack to try to grab the assailant’s weapon”); Boyd v. State, 910 So.2d 167, 191 (Fla.2005) (upholding HAC in stabbing death because the medical examiner testified that the victim could not have sustained the defensive wounds if she was unconscious and, therefore, “[w]hile the exact order of wounds could not be established, there was competent, substantial evidence to support the trial court’s finding that [the victim] was alive and conscious for some of the attack, and was struggling with her attacker”); Dennis, 817 So.2d at 766 (upholding HAC in two brutal beating deaths because the evidence supported the finding that both victims were conscious for at least part of the attack because they had defensive wounds to them hands and forearms; there was also evidence that one victim got to his feet and struggled after the defendant left the room); Roberts v. State, 510 So.2d 885, 894 (Fla.1987) (upholding HAC where the victim was killed as a result of numerous blows to the back of the head and the evidence of severe injury to the victim’s hands “support[ed] the conclusion that after the initial blow from behind, [the victim] attempted to fend off further blows”); Heiney v. State, 447 So.2d 210, 216 (Fla.1984) (upholding HAC where there were seven hammer blows inflicted on the victim’s head and “[t]he medical examiner testified that the injuiies to the victim’s hands were probably defense wounds caused by the victim’s holding his hands up to try to protect himself’).
The trial court found in pertinent part based on the circumstances of the crime *685 and the testimony of the medical examiner as follows:
Ms. Telzer-Bain’s perception of her circumstances no doubt involved extreme fear, tremendous pain, and impending doom. 82-year-old Renie Tel-zer-Bain was surprised in her home by a 6' 5", 200 pound intruder whom she very well may have recognized. It is unclear if Ms. Telzer-Bain was asleep in the bedroom where she was found or was awake when the Defendant entered her home. What is clear is that she never had a chance. Most of Ms. Tel-zer-Bain’s injuries were to her back— back of her head, back of her neck, and her right back. Other than her leg/ knee, the only injury to the front of Ms. Telzer-Bain was an injury to the front of her neck. The Defendant caused these injuries by taking a hammer and using the round, flat head to strike Ms. Telzer-Bain and using the claw portion of the hammer to rip and tear Ms. Tel-zer-Bain’s skin, fat, and tissue. 17 to 20 times the Defendant struck this defenseless woman with such force that her skull was pressed into her brain and her rib was broken. Ms. Telzer-Bain, unwilling to just give up her life, tried to protect herself as is evidenced by the defensive injuries she sustained on her hand and arm.
Dr. Rao testified Ms. Telzer-Bain was alive when she received all of these injuries and the injuries she sustained would have caused tremendous pain. While Dr. Rao testified the injuries to the head would have caused Ms. Telzer-Bain to have lost consciousness very quickly, and the fact that there were defensive injuries suggests the head injuries were not the first sustained.
We conclude that the trial court’s finding of HAC is supported by competent, substantial evidence.
The defensive wounds to the victim’s hand and arm clearly demonstrate that the victim was conscious and aware of her impending death and attempting to fend off the attack. King nevertheless contends that this case is unlike other cases in which we have upheld HAC, because those cases involved a greater number of defensive wounds than are present in this case. However, this Court has never required a minimum number of defensive wounds in order to sustain a finding of HAC.
Cases such as Williams v. State, 37 So.3d 187 (Fla.2010), and Zakrzewski v. State, 717 So.2d 488 (Fla.1998), where this Court struck the HAC aggravator, are distinguishable because in both of those cases, there was no evidence that the victim was conscious and aware of her impending death. See Williams, 37 So.3d at 200 (striking HAC where any of the five blows to the head could have resulted in unconsciousness or death, the entire attack could have taken place in seconds, and the evidence did not establish the existence of any defensive wounds); Zakrzewski, 717 So.2d at 493 (striking HAC for one of the victims where “[mjedical testimony was offered during the trial which established that [the victim in question] may have been rendered unconscious upon receiving the first blow from the crowbar, and as a result, she was unaware of her impending death”); see also Simmons v. State, 419 So.2d 316, 317, 319 (Fla.1982) (striking HAC where “[d]eath was probably instantaneous or nearly so; an expert testified that either of the two blows could have caused instantaneous death by itself’). .
In contrast, the attack in this case was particularly vicious in that the seventeen to twenty blows were inflicted on this elderly victim with both the head and claw of the hammer, and the blows were forceful enough to tear holes in the back of the victim’s neck, fracture her ribs, and ulti *686 mately cause depressed skull fractures. Dr. Rao, the medical examiner, could not determine how long the attack took, but it was certainly not seconds based on the significant number of blows inflicted. Although Dr. Rao also could not testify to the sequence of the blows, Dr. Rao testified that the wounds on the victim’s right hand and left arm were defensive wounds, sustained as the victim was trying to ward off blows.
Accordingly, we conclude that the trial court’s finding of HAC is supported by competent, substantial evidence, and we reject King’s argument to the contrary.
II. Proportionality
King next contends that his death sentence is disproportionate, regardless of whether this Court strikes the HAC aggravator. “The death penalty is ‘reserved only for those cases where the most aggravating and least mitigating circumstances exist.’” Silvia v. State, 60 So.3d 959, 973 (Fla.2011) (quoting Terry v. State, 668 So.2d 954, 965 (Fla.1996)). “Therefore, in deciding whether death is a proportionate penalty, the Court makes a ‘comprehensive analysis in order to determine whether the crime falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the sentence.’ ” Id. (quoting Anderson v. State, 841 So.2d 390, 407-08 (Fla.2003)). Accordingly, the Court “considers] the totality of the circumstances of the case and compare[s] the case to other capital cases.” Offord v. State, 959 So.2d 187, 191 (Fla.2007). “This analysis ‘is not a comparison between the number of aggravating and mitigating circumstances.’ ” Silvia, 60 So.3d at 973 (quoting Porter v. State, 564 So.2d 1060, 1064 (Fla.1990)). “Rather, this entails ‘a qualitative review by this Court of the underlying basis for each aggravator and mitigator rather than a quantitative analysis.’ ” Id. (quoting Urbin v. State, 714 So.2d 411, 416 (Fla.1998)). “In reviewing the sentence for proportionality, this Court will accept the jury’s recommendation and the weight assigned by the trial judge to the aggravating and mitigating factors.” Id.
In this case, the jury recommended death by a vote of eight to four. The trial court found the following aggravating circumstances: (1) the capital felony was committed while the defendant was engaged in the commission of a felony (burglary) and for the purpose of pecuniary gain (merged); and (2) the murder was HAC. The trial court gave both aggravating factors great weight. The trial court found no statutory mitigating factors, but found numerous nonstatutory mitigating factors.
The facts of this case are remarkably similar to Beasley v. State, 774 So.2d 649 (Fla.2000). In Beasley, the defendant was staying at the victim’s house for a few days while performing some pressure washing and painting at apartments the victim managed so that the victim could drive the defendant to and from work. Id. at 653. When the victim’s daughter had not heard from her for two days, she traveled to her mother’s home to make sure she was all right. Id. The victim had been bludgeoned to death, likely with a hammer, sustaining fifteen to seventeen blows to the head, as well as defensive injuries to both hands, her left forearm, her upper arm and upper chest area, and to the top of her left shoulder. Id. at 654-55, 660. Her car was missing, as well as $900 in cash. Id. at 654, 656. The trial court found the same two aggravating factors as in this case: HAC and’committed during the course of a felony (robbery), which was merged with pecuniary gain. Id. at 674. The trial court gave little weight to the commission during the course of a robbery *687 aggravator and very great weight to the HAC aggravator. Id. at 674 n. 15. Also as in this case, the trial court did not find any statutory mitigating factors, but found numerous nonstatutory mitigators. Id. The nonstatutory mitigation found in Beasley included that the defendant was a good son, maintained contact with his children and grandchildren, participated in church, and had mental or neurological damage resulting from alcohol and drug abuse. Id. We reject King’s argument that there are significant distinctions-such as the number of defensive wounds — between this case and Beasley that would lead us to conclude that this case is disproportionate.
Accordingly, we conclude that King’s death sentence is proportionate.
III. Prosecutor’s Closing Argument
In this claim, King contends that the trial court erred in allowing the prosecutor to make certain comments during the penalty-phase closing argument. Specifically, King asserts that the prosecutor improperly argued that the homicide was committed to eliminate the victim as a witness to the burglary because the State never sought the aggravating circumstance of committed to avoid arrest. Defense counsel did not object to any of the comments.
“Attorneys are permitted wide latitude in closing argument, but that latitude does not extend to allowing improper argument.” Silvia, 60 So.3d at 977. “[T]he proper exercise of closing argument is to review the evidence and to explicate those inferences which may reasonably be drawn from the evidence.” Gonzalez v. State, 990 So.2d 1017, 1028-29 (Fla.2008) (quoting Bertolotti v. State, 476 So.2d 130, 134 (Fla.1985)). “Counsel must contemporaneously object to improper comments to preserve a claim for appellate review. Unobjected-to comments are grounds for reversal only if they rise to the level of fundamental error.” Merck v. State, 975 So.2d 1054, 1061 (Fla.2007).
A review of the context surrounding the comments in this case reveals that the prosecutor’s statements were not only “fair comments] on the evidence adduced at trial,” Wade v. State, 41 So.3d 857, 868 (Fla.2010), but were used to argue that the committed during the course of a burglary aggravator should be accorded significant weight. Even assuming that the comments were improper, they clearly did not rise to the level of fundamental error-that is, error that “reaches down into the validity of the trial itself to the extent that a ... jury recommendation of death could not have been obtained without the assistance of the alleged error.” Poole v. State, 997 So.2d 382, 390 (Fla.2008) (quoting Card v. State, 803 So.2d 613, 622 (Fla.2001)).
Accordingly, we deny this claim.
IY. Defense Counsel’s Closing Argument
In his .next claim, King argues that the trial court erred in precluding defense counsel from arguing to the jury that the aggravation the State used as grounds for the death penalty did not include evidence that King had a long history of violent crimes. The State objected to the defense’s argument on the basis that there was no evidence presented that the defendant did not have a history of violence.
“In closing argument, counsel is permitted to review the evidence and fairly discuss and comment upon properly admitted testimony and logical inferences from that evidence.” Conahan v. State, 844 So.2d 629, 640 (Fla.2003). However, this Court has “long held that argument on matters outside the evidence is improper.” Bigham v. State, 995 So.2d 207, 214 (Fla.2008). “A trial court has discretion in controlling opening and closing statements, *688 and its decisions will not be overturned absent an abuse of discretion.” Merck, 975 So.2d at 1061.
King contends that the argument that defense counsel sought to make was relevant to show nonstatutory mitigation of no previous crimes of violence, which was in fact found by the trial court. We reject King’s contention because the trial court’s finding of this mitigating factor was based on evidence not presented to the jury, specifically a Presentence Investigation (PSI) Report.
King also contends that defense counsel was merely arguing the lack of a prior violent felony aggravator. However, no such aggravator was sought by the State, and the jury was not instructed on the prior violent felony aggravator. Further, there was no evidence presented to the jury on King’s criminal history whatsoever. Accordingly, the prior violent felony aggravator was not germane to the jury’s consideration, and it was within the trial court’s discretion to preclude defense counsel from arguing it. Cf. Bigham, 995 So.2d at 214-15 (holding that the trial court did not abuse its discretion in precluding the defendant from arguing that the State failed to prove two counts of sexual battery and kidnapping it had already dismissed via judgment of acquittal because “after the trial court’s dismissal of those charges, the counts of sexual battery and kidnapping were no longer germane to the jury’s consideration and were properly restricted from closing argument by the trial judge”).
Moreover, we note that King did have an extensive criminal history of seven felony convictions. However, because King did not assert as a mitigating circumstance that he had no significant criminal history, the State was precluded from presenting evidence of King’s criminal history to the jury. See Walton v. State, 547 So.2d 622, 625 (Fla.1989).
King relies on Conahan, 844 So.2d at 640, in which the prosecutor “remarked upon the lack of certain mitigating factors” and the trial court overruled an objection to the comment. This Court held that the prosecuting attorney’s comment was not improper:
The record reflects that in light of Conahan’s presentation of mitigating evidence, the prosecutor commented in his closing argument that there was no evidence presented regarding other possible mitigators. He pointed out that Co-nahan did not show that he suffered from prior child abuse or drug abuse, or had a history of mental difficulties and mistreatment. In making such a remark, the prosecutor was commenting upon the lack of certain mitigating evidence. His comment did not implicate the defendant’s right to remain silent; rather, it concerned the dearth of mitigating evidence.
Id. However, in Conahan, unlike in this case, the defense presented evidence on mitigating factors. Accordingly, the prosecution was permitted to comment on that evidence and what the evidence did — and did not — demonstrate. Here, in contrast, there was no evidence presented to the jury regarding King’s criminal history or the prior violent felony aggravator.
Accordingly, we conclude that the trial court did not abuse its discretion in precluding the defense from arguing a lack of violent criminal history during its penalty-phase closing argument. However, even if the trial court did err, any such error would be harmless beyond a reasonable doubt. In light of the aggravation and mitigation presented in this case, there is no reasonable possibility that any error would have contributed to the sentence *689 imposed. See State v. DiGuilio, 491 So.2d 1129, 1139 (Fla.1986).
V. Ring v. Arizona
In his final claim, King contends that Florida’s death penalty statute is unconstitutional pursuant to Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). He acknowledges this Court’s precedent to the contrary and requests that this Court reconsider that precedent. In any event, Ring does not apply to this case because the jury unanimously convicted King of burglary during the guilt phase of the trial and one of the aggravating circumstances found by the trial court in this case was that the murder occurred during the commission of a burglary. See Baker v. State, 71 So.3d 802, 824 (Fla.2011) (“Ring is not implicated when the trial court has found as an aggravating circumstance that the crime was committed in the course of a felony.... Baker was convicted of both home invasion robbery and kidnapping by a unanimous jury during the guilt phase of his trial. Accordingly, Ring is not implicated.”), cert. denied, — U.S.-, 132 S.Ct. 1639, 182 L.Ed.2d 238 (2012).
Accordingly, we deny relief on this claim.
VI. Sufficiency of the Evidence
Finally, we review the sufficiency of the evidence to support the first-degree murder conviction in this case. Although King does not challenge the sufficiency of the evidence, this Court has a mandatory obligation to review the sufficiency of the evidence in every case in which a sentence of death has been imposed. See Jones v. State, 963 So.2d 180, 184 (Fla.2007); Fla. R.App. P. 9.142(a)(5) (“On direct appeal in death penalty cases, whether or not insufficiency of the evidence or proportionality is an issue presented for review, the court shall review these issues and, if necessary, remand for the appropriate relief.”). “In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons v. State, 934 So.2d 1100, 1111 (Fla.2006) (quoting Bradley v. State, 787 So.2d 732, 738 (Fla.2001)). Evidence is insufficient “in a circumstantial evidence case if the [S]tate fails to present evidence from which the jury can exclude every reasonable hypothesis except that of guilt.” Orme v. State, 677 So.2d 258, 262 (Fla.1996) (quoting State v. Law, 559 So.2d 187, 188-89 (Fla.1989)).
The record contains sufficient evidence to support King’s conviction for the first-degree murder of Renie Telzer-Bain. The victim was found murdered in her home. Her car was missing, and numerous items were missing from her house. King was previously employed by a lawn service company that maintained Renie’s lawn. The owner of the lawn service company, Roman, testified that he and King always worked together on the victim’s lawn and that King had never been inside Renie’s house. He testified that Renie never gave food or drinks to him or King. Roman also testified that King called him while he was on vacation and asked if he had heard about the murder, and King usually only called Roman about work matters.
Renie’s Cadillac was discovered in close proximity to King’s apartment. King’s cousin testified that King let him borrow the vehicle. King pawned Renie’s bracelet, and police discovered numerous items belonging to Renie in King’s apartment. When questioned, King stated that he knew Renie because he mowed her lawn, but that he had never been inside her house. He claimed that he bought the bracelet from an individual known as “Bu- *690 dha” and that he found the items identified as Renie’s in a vacant apartment near his home.
DNA on a piece of melon on Renie’s dining room table was determined to match King’s DNA. Although the DNA on the melon yielded only a partial profile (11 of 13 loci), the DNA profile has an occurrence in the population of 1 in 440 trillion Caucasians, 1 in 770 trillion African-Americans, and 1 in 280 trillion southeastern Hispanics.
When questioned by police a second time, King changed his story, stating that he had been inside the victim’s house and that his DNA was on the fruit because Renie had served fruit to him and Roman when they were previously at her house. However, Roman testified that King last worked for him at the lawn service company at the end of October, and Renie was murdered and the fruit recovered from the table at the end of December — two months later.
Based on a review of the evidence presented in this case, “a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt.” Simmons, 934 So.2d at 1111 (quoting Bradley, 787 So.2d at 738). The evidence was such that the “jury can exclude every reasonable hypothesis except that of guilt.” Orme, 677 So.2d at 262. Thus, there was sufficient evidence to support King’s conviction for first-degree murder.
CONCLUSION
Based on the foregoing, we affirm King’s convictions and sentence of death.
It is so ordered.
POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

. The television missing from Renie’s residence was never located. Police also did not find the car keys for the Cadillac.

. Spencer v. State, 615 So.2d 688 (Fla.1993).

. The trial court found the following nonstat-utory mitigating circumstances: (1) the defendant is a good inmate (slight weight); (2) the defendant has the potential for rehabilitation and would positively contribute to the prison population (slight weight); (3) the defendant has a lack of violent history (little weight); (4) the defendant is a good parent and loves his son, and his son loves him (moderate weight); (5) the defendant loves children in general, and they love him (moderate weight); (6) the defendant is the only biological child of his mother and father (little weight); (7) the defendant’s parents divorced when he was a young child, which negatively affected his relationship with his father (little weight); (8) the defendant was on track and football teams in high school (slight weight); (9) the defendant graduated from high school and attended community college (little weight); (10) the defendant was close with his mother and took his mother's death very hard (some weight); (11) the defendant went to church with his mother- and even considered becoming a minister (slight weight); (12) the defendant cared for his family members when they were ill (moderate weight); (13) the defendant loves his sister and she loves him (little weight); (14) the defendant was employed throughout his life (no weight); (15) the defendant has family members who write him letters and visit him and would continue to do so if he was sentenced to life in prison (slight weight); and (16) if the defendant were sentenced to death, it would adversely affect his family (some weight).